**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

| | | |
|---|---|---|
| RANDALL BARDE and CARLA VARNER, individually and on behalf of a class of persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RICKY D. DIXON, in his official capacity as Secretary of the Florida Department Corrections; and CENTURION OF FLORIDA, LLC, a company registered and doing business in Florida,<br><br>Defendants. | ) | Case No.<br><br>Jury Trial Demand |

**CLASS ACTION COMPLAINT FOR**
**<u>INJUNCTIVE RELIEF AND INDIVIDUAL CLAIMS FOR DAMAGES</u>**

**<u>Preliminary Statement</u>**

1. Plaintiffs bring this action against the Secretary of the Florida Department of Corrections (FDC) and its contractor, Centurion of Florida, LLC (Centurion), for refusing to provide timely medical care to Plaintiffs and hundreds of other incarcerated people, causing them to go blind from cataracts rather than providing necessary surgeries. A cataract is a clouding of the eye's lens that impairs vision and can cause blindness. The only treatment for cataracts is surgery. However, Defendants have a policy, practice, and custom of letting cataracts mature to the point of blindness before even considering surgery and then delaying consultations and surgeries for months or years on end. This has resulted in hundreds of people living with preventable blindness for years. Such policy, practice, and custom places incarcerated people at

serious risk for permanent vision loss, falls, fractures, abuse, and even death, all of which violate the Eighth and Fourteenth Amendments to the United States Constitution.

**Jurisdiction and Venue**

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 in that this is a civil action arising under the Constitution of the United States that seeks to redress the deprivation, under color of state law, of rights secured to the Plaintiffs by the Constitution and laws of the United States.

3. Plaintiffs' claims for relief are also predicated, in part, upon 42 U.S.C. § 1983, which authorizes actions to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the Constitution and laws of the United States, and upon 42 U.S.C. § 1988, which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and § 1391(c), as many of the events or omissions giving rise to the claims occurred in this judicial district, Defendants do substantial business in this judicial district, and the FDC is headquartered in Tallahassee, Florida.

**Parties**

5. Plaintiff Randall Barde is currently incarcerated in the FDC system at Reception and Medical Center in Union County, Florida. Mr. Barde has exhausted all available administrative remedies.

6. Plaintiff Carla Varner is currently incarcerated in the FDC system at Lowell Correctional Institution Annex in Marion County, Florida. Ms. Varner has exhausted all available administrative remedies.

7. Defendant Dixon is the Secretary of the FDC, an agency of the State of Florida. Defendant Dixon maintains and operates 134 correctional facilities throughout the state of Florida and is and was at all relevant times responsible for the actions, inactions, policies, procedures, and practices of the FDC and its employees and/or contracted agents. FDC is headquartered in Tallahassee, Florida. References to “FDC” or “Florida Department of Corrections” in this Complaint refer to Defendant Dixon.

8. Defendant Centurion is a company registered and doing business in Florida.

9. At all times relevant to this lawsuit, Defendant Dixon had, and continues to have, a non-delegable duty to provide constitutionally adequate healthcare services to individuals in its system.

10. At all relevant times to this lawsuit, Defendant Dixon contracted with Defendant Centurion to provide healthcare services to all people confined in FDC, state-run facilities.

11. At all times relevant to this lawsuit, Defendants Dixon and Centurion were responsible for healthcare services for Plaintiff Randall Barde and Plaintiff Carla Varner.

12. The actions of the Defendants, as herein alleged, were performed under color of state law and constitute state action.

## Factual Allegations Common to All Plaintiffs and Class Members

### *Cataracts*

13. A cataract is when the eye’s natural lens becomes cloudy. Proteins in the lens break down and cause things to look blurry, hazy, or less colorful.

14. Symptoms of cataracts may include blurry vision, seeing double or a ghosted image out of the eye, being extra sensitive to light, having trouble seeing well at night, needing more light when reading, and seeing bright colors as faded or yellow instead.

15. Aging is the most common cause of cataracts. People over 60 usually start to have some clouding of their lenses.

16. The only treatment for cataracts is surgery.

17. During cataract surgery, an eye surgeon (ophthalmologist) removes the eye's cloudy, natural lens and replaces it with an artificial lens.

18. Modern cataract surgery is safe and performed on an outpatient basis in minutes.

19. Left untreated, cataracts will cause partial or complete blindness.

20. Cataracts are the leading cause of preventable blindness in developing countries with poor healthcare systems.

21. In the United States, cataract surgery is typically recommended when cataracts impair vision or interfere with activities of daily living.

22. The Centers for Medicare and Medicaid Services (Medicare) authorize cataract surgery when a patient's visual acuity in the affected eye is worse than 20/40. Medicare also authorizes cataract surgery when a patient has significant glare sensitivity. Medicare also authorizes cataract surgery when a patient's cataract interferes with essential tasks like reading or self-care.

23. Delaying cataract surgery for patients who need it can have severe consequences.

24. Once a patient qualifies for surgery, delaying surgery can significantly increase their risk of falls and other accidents.

25. Reducing a patient's risk of falls and fractures is not insignificant. Studies have shown a marked reduction in mortality after cataract surgery.

26. Delaying cataract surgery can also negatively impact patients' mental health and wellbeing. For example, untreated cataracts substantially increase a patient's risk of developing dementia.

27. Delays in cataract surgery can make it difficult for medical providers to assess other eye conditions, which increases the risk of permanent vision loss.

28. Delaying surgery until a cataract is advanced also increases surgical risk, slows visual recovery, and increases the risk of permanent vision impairment or blindness.

29. Left untreated for years, cataracts can swell or burst, causing glaucoma (high pressure from a large cataract causing blockage of the drainage angle or proteins from the mature cataract leaking out and causing blockage of the drainage angle) leading to a surgical emergency, that may further jeopardize visual potential and leave an individual at risk of falls, inability to protect themself due to limited peripheral vision on the affected side, headaches, and vision strain from constant double vision..

30. Cataracts and the resulting consequences of delays are objectively serious medical needs.

31. Delaying cataract surgery causes a substantial risk of all these complications occurring, potentially leading to permanent vision impairment or blindness.

***Defendants' Unlawful Policy of Denying and Delaying Cataract Surgeries***

32. Florida has the third largest state prison population in the country. As of 2024, Florida had over 87,000 prisoners. Of those over 87,000 prisoners, 12.6 percent or 10,907 were aged 60 or older.

33. The population of elderly prisoners in Florida is expected to increase every year, in part because Florida has abolished parole.

34. Approximately one in five people between the ages of 65 and 74 have cataracts that affect their vision, and 50% of seniors will develop cataracts by their mid-seventies to mid-eighties.

35. Thus, an estimated 2,000 Florida prisoners are affected by cataracts, and that number will only grow every year.

36. Defendants have a policy, practice, and custom of delaying necessary cataract surgeries, which has harmed hundreds if not thousands of prisoners by causing them to needlessly suffer from partial or total blindness and face a higher risk of surgical complications that can lead to permanent impaired vision or blindness.

37. Defendants have effectuated that policy, practice, and custom by denying prisoners with cataracts access to eyecare specialists.

38. Defendants do not have ophthalmologists on staff. Rather, they have to pay outside doctors to provide this specialized care. This by itself greatly limits patients' access to necessary care.

39. On top of limiting patient access to ophthalmologists, Defendants do not use the community standard of care to determine who can be considered for cataract surgery.

40. Rather, Defendants require an individual's cataracts to advance to the point of blindness before even considering them for surgical evaluation by an ophthalmologist.

41. Prisoners only qualify for surgery if their best corrected visual acuity (BCVA) is 20/50 or worse *in both eyes*.

42. This means that even if an individual has a cataract that is causing legal blindness in their affected eye, if their other eye has a BCVA better than 20/50, they will be denied surgery.

43. Essentially, prisoners are being denied medically necessary cataract surgery, because they still have "one good eye."

44. In that situation, an individual's cataract would have to amount to near-total blindness (only being able to perceive light or hand motion) before even being considered for surgery.

45. Further, these vision cutoffs are implemented for best *corrected* visual acuity, despite the fact that many prisoners with cataracts are denied glasses.

46. Even when prisoners with cataracts meet the cutoffs and are finally approved for an appointment with an ophthalmologist, Defendants routinely impose delays of many months or years to see the ophthalmologist.

47. Even in cases where prisoners are permitted go to their appointment with the ophthalmologist and are recommended for surgery, Defendants routinely impose delays of many months or years waiting for the recommended surgery.

48. Defendants' policy, practice, and custom also subjects such prisoners to the substantial risk of complications if and when surgery is eventually provided, potentially leading to permanent vision loss or blindness.

49. In some cases, prisoners have waited five or six years for surgery.

50. In other cases, due to Defendants' cutoffs and delays, prisoners with severe vision loss due to cataracts in both eyes have only been provided surgery in one eye. This is dangerous.

51. Vision relies on both eyes working together. If one eye has a clear lens implant and the other still has a cataract, the brain cannot easily merge the two images. This leads to impaired depth perception, poor hand-eye coordination, and difficulty judging distances—important for walking, driving, and avoiding falls.

52. In a prison setting, it also impairs an individual from protecting themselves from potential attacks or avoiding hazards, which may cause an individual to trip and fall.

53. After the first cataract is removed, that eye often sees well without glasses while the untreated eye may remain nearsighted or farsighted. The large difference in prescription between the two eyes can cause double vision, eyestrain, headaches, or imbalance (aniseikonia) that cannot be corrected with glasses alone.

54. There is a lower risk of falls and fractures after both eyes have been treated compared with just one, especially in older adults.

55. The American Academy of Ophthalmology states that cataract surgery in the second eye is appropriate when a cataract limits visual function or causes symptomatic anisometropia (difference in prescription between two eyes), and when surgery is likely to improve vision or functional status.

56. Defendants' policy, practice, and custom have led to numerous prisoners suffering from preventable blindness for years and has subjected them to the substantial risk of serious harm from complications, including permanent vision loss or impairment, and falls.

57. In June 2024, the Florida Cares Charity sent an email to Defendant Dixon, which was forwarded to Defendant Centurion, notifying them 25 people had been subjected to delays and denials of ophthalmological care, including cataract surgery.

58. In internal communications regarding this request, FDC officials noted that the delays and denials of ophthalmological care may have been caused by Centurion's "backlog related to eyecare" that "has been discussed for quite some time in our [] meetings."

59. Indeed, in 2024, there were at least 1,000 prisoners waiting to have cataract surgery, according to a list maintained by Defendant Centurion.

60. On February 25, 2025, Plaintiffs' counsel sent a letter to Defendants via email, notifying them of their unlawful policy and practice of delays in eyecare, and including examples

of 15 people who had been subjected to these delays, with descriptions of what had occurred to each person.

61. Each Defendant responded but refused to address the substance of the claims.

62. To date, Defendants have not taken sufficient action to abate the risk of harm caused by these delays. They have not responded reasonably to the risk.

63. Defendants' policy, practice, and custom have also led to numerous prisoners suffering from permanent vision loss, falls, fractures, abuse, and even death.

***The Named Plaintiffs***

*Plaintiff Randall Barde*

64. Plaintiff Randall Barde entered the FDC prison system in October 2013.

65. At some point while incarcerated, Mr. Barde developed cataracts that caused him difficulty seeing by 2017 or earlier.

66. In November 2019, ophthalmologist Dr. Benjamin Hasty recommended that Mr. Barde have cataract surgery in both eyes "soon."

67. Dr. Hasty noted that the cataracts prevented Mr. Barde from reading and watching TV.

68. Dr. Hasty also noted that the cataracts "severely affects ADL [activities of daily living]" and circled that note.

69. Dr. Hasty also noted that Mr. Barde had light sensitivity, that lights appeared to have blue rings around them, and that everything looked smokey to him.

70. Three months passed, during which Defendants failed to provide Mr. Barde with the recommended surgery.

71. In February 2020, Dr. Hasty saw Mr. Barde again. This time, the worsening of Mr. Barde's cataracts led Dr. Hasty to recommend complex cataract surgery, and he warned that Mr. Barde might require cornea transplantation.

72. Dr. Hasty also wrote that Mr. Barde needed a key lock (as opposed to a combination lock) to secure his property until his vision improved.

73. Four months passed, during which Defendants again failed to provide Mr. Barde with the recommended surgery. During that time, Defendants also failed to provide Mr. Barde with a key lock or other necessary accommodations for his blindness.

74. In June 2020, Mr. Barde saw optometrist Dr. Kelli Parks, who noted that Mr. Barde had visually significant cataracts and that glasses did not improve his vision.

75. Dr. Parks wrote: "Please schedule cataract surgery with Dr. Hasty as he requested" and to "[r]efer ASAP – meet[s] DOC criteria." Dr. Parks reiterated the request that Mr. Barde be issued a key lock pass.

76. However, for a third time, Defendants did not schedule Mr. Barde for surgery with Dr. Hasty, and they did not permit him to see an eye specialist again for a year and a half.

77. In December of 2021, Mr. Barde saw optometrist Dr. Idania Fernandez.

78. Dr. Fernandez documented that Mr. Barde continued to be legally blind and that "glasses do not improve [his] vision whatsoever." Like the other doctors, Dr. Fernandez recommended Mr. Barde for cataract surgery.

79. However, Defendants continued to deny Mr. Barde cataract surgery, and he did not see another eyecare doctor for an additional year and a half.

80. In June of 2022, Mr. Barde was seen by ophthalmologist Dr. Joseph Selem. Like Dr. Hasty (twice), Dr. Parks, and Dr. Fernandez, Dr. Selem recommended cataract surgery.

81. Again, Defendants continued to deny Mr. Barde's surgery.

82. About six months later, in January 2023, Mr. Barde saw optometrist Dr. Joshua Black at the Bascom Palmer Eye Institute, who also recommended surgery.

83. At this point, statewide Medical Director for Defendant Centurion Dr. John Lay was alerted to Mr. Barde's case and his urgent need for cataract surgery.

84. Dr. Lay is, and was at all relevant times, one of the individuals responsible for Defendant's provision of medical care to people in incarcerated in Florida. He is a policymaker for Centurion and acts on Centurion's behalf.

85. Despite six previous surgery recommendations (three by ophthalmologists and three by optometrists), Dr. Lay recommended that Mr. Barde see another eye doctor for further evaluation to be considered for cataract surgery.

86. It took eleven months for Mr. Barde to see yet another doctor for cataract surgery evaluation.

87. This time, ophthalmologist Dr. Gustavo Munguba of Envision Eyecare recommended surgery for Mr. Barde.

88. Dr. Munguba noted that the surgery would be complicated due to Mr. Barde's very mature cataracts with the potential need for further surgery with a specialist.

89. However, for over a year, Defendants continued to delay the recommended surgery for Mr. Barde.

90. He finally received surgery in his left eye in January of 2025—six years after the surgery was first recommended and at least eight years after he first started experiencing significant vision loss due to his cataracts.

91. As a result of Defendants delaying his cataract surgery for so long, the surgery in Mr. Barde's left eye was complex and did not lead to vision recovery.

92. As a result of Defendants delaying his cataract surgery for so long, Mr. Barde may have permanent vision loss in his left eye and may need a cornea transplant.

93. Defendants have still not provided cataract surgery for Mr. Barde's right eye.

94. As noted above, on February 25, 2025, Mr. Barde's counsel sent a letter via email to Defendants, notifying them of their unlawful policy and practice of delays in eyecare, and including examples of 15 people who had been subjected to these delays, with descriptions of what had occurred to each person. Mr. Barde was one of those examples.

95. Despite this notice, as of this filing, eight months later, Defendants have still not provided Mr. Barde with surgery for his right eye and have not permitted Mr. Barde to be evaluated for cornea transplantation in his left eye.

96. Thus, Mr. Barde has been left totally blind in one eye and with vision loss in the other due to Defendants' deliberate indifference to his serious medical need.

97. Mr. Barde has suffered and continues to suffer from physical injuries, and this infirmity has caused him to be victimized in prison.

98. There is no question that Mr. Barde qualified for cataract surgery and needs cataract surgery.

99. There is no question that Mr. Barde urgently needs to see a specialist to try to save the vision in his left eye.

100. Nonetheless, Mr. Barde was made to suffer from preventable blindness for years and now may have permanent vision loss due to the Defendants' delay in treating his cataracts.

*Plaintiff Carla Varner*

101. Plaintiff Carla Varner is incarcerated in the FDC system and has been in 2013.

102. Defendants delayed Ms. Varner's cataract surgery for her right eye for over two-and-a-half years and continue to delay surgery for her left eye for nonmedical reasons.

103. During this time, Ms. Varner has suffered and continues to suffer from legal blindness and has been physically injured as a result of not being able to see.

104. Due to the delay in surgery, Ms. Varner's surgery will also be complicated, and she too is at risk of permanent vision loss.

105. In January 2023, Ms. Varner was documented as having cataracts that caused serious vision loss in both eyes. At the time, the visual acuity was 20/200 in her right eye and 20/400 in her left. The optometrist recommended her for a cataract surgery consult.

106. Two months later, in March 2023, Ms. Varner was seen by an ophthalmologist who recommended cataract surgery. However, Defendants refused to schedule her surgery.

107. In August 2023, Ms. Varner reported to Centurion providers that her eyesight was severely impaired due to cataracts. She reported that she had run into objects, had almost fallen, and needed help to open her locker, write forms, and read and write mail. She reported that she needed an impaired inmate assistant to help her on a regular basis but that she had not been provided with one.

108. She asked whether her surgery could be prioritized or sped up.

109. In January 2024, Ms. Varner reported to Centurion providers that she could not see well enough to trim her own toenails, which were growing too long and causing her pain. That same month, Ms. Varner was issued a blind cane.

110. In May of 2024, Ms. Varner saw a second ophthalmologist who also recommended cataract surgery. The doctor noted that Ms. Varner was totally blind. Her vision in both eyes was

limited to “HM” or “hand movements,” meaning she could only see if something was moving within about arms-length but nothing further.

111. The doctor also noted that due to the maturity of the cataracts, the surgeries would have increased risks of complications, and Ms. Varner may need further surgery with a specialist.

112. However, Defendants still refused to schedule her urgently needed surgery.

113. Around June of 2024, Ms. Varner began to develop pain in her eyes due to the untreated cataracts.

114. Over one year later, in August 2025, Ms. Varner saw an optometrist who noted her cataracts were causing legal blindness. He wrote that she needed surgical intervention.

115. Recently, after years of waiting, Ms. Varner was finally provided cataract surgery in her right eye.

116. However, despite repeated recommendations by multiple doctors, Ms. Varner still has not been provided cataract surgery for her left eye.

117. As a result of the delay in care, Ms. Varner has suffered and continues to suffer from physical injuries, and this infirmity has caused her to be victimized in prison.

118. There is no question that Mr. Varner qualifies for cataract surgery and needs cataract surgery.

119. Nonetheless, Ms. Varner has been made to suffer from preventable blindness for years and is at serious risk for permanent vision loss due to the Defendants’ delay in treating her cataracts.

***<u>Other Examples of Defendants’ Failure to Provide Cataract Surgeries</u>***

120. Because of Defendants’ policy, practice, and custom of not providing medically needed cataract surgeries, numerous people have not received surgery, have been left with limited

to no vision, and are at an increased risk of permanent vision loss, falling, fracture, abuse, and even death.

121. Others have been left blind for years and have suffered injuries and permanent vision loss.

122. Below are several examples of individuals who have been harmed by Defendants' policy, practice, and custom. This list is not exhaustive.

***B.C.***

123. B.C. entered the FDC prison system in October 2014.

124. Defendants delayed B.C.'s cataract surgery for eight years for nonmedical reasons.

125. In 2016, B.C. began experiencing decreased vision due to cataracts. His visual acuity decreased to 20/200 in both eyes.

126. Despite B.C.'s serious vision loss that clearly qualified him for surgery, he was not referred for surgical consultation.

127. In 2020, B.C. continued to complain of vision issues in both eyes, and he was seen several times by Centurion providers and referred to an ophthalmologist for surgical consultation.

128. However, Centurion refused to schedule B.C. for surgical consultation.

129. In June 2021, he saw an optometrist, who wrote that B.C. had "severe" cataracts and that he met DOC criteria for surgery.

130. Finally, in November 2021, B.C. was able to see an ophthalmologist. The ophthalmologist recommended cataract surgery.

131. However, while Centurion initially approved surgery for B.C., they failed to schedule it due to there being a "big back log at [the prison hospital]" for the procedure.

132. By January 2023, B.C.'s vision had deteriorated so much that he could no longer see well enough to get around independently and was issued a blind cane. Still, no surgery was provided.

133. Instead, Centurion added B.C. to a new waitlist for surgical evaluation with a different ophthalmology practice.

134. A year and a half later, B.C. was desperate for surgery. He wrote to the Centurion providers in November 2024 that his cataracts have left him "totally blind and totally dependent on assistance from others" and that he needed surgery as soon as possible.

135. After that, Centurion scheduled B.C. to see a fourth ophthalmologist in December 2024. That ophthalmologist recommended urgent, complex cataract surgery.

136. On February 25, 2025, undersigned counsel sent a letter via email to Defendants, notifying them of their unlawful policy and practice of delays in eyecare, including examples of 15 people who had been subjected to these delays, with descriptions of what had occurred to each person. B.C. was one of those examples.

137. In March 2015, more than eight years after he began experiencing serious vision loss and nearly four years after an ophthalmologist recommended treatment, B.C. finally received cataract surgery in his left eye.

138. In April 2025, B.C. finally received surgery in his right eye.

139. Unfortunately, as a result of Defendants delaying his cataract surgery for so long, the cataract surgeries were complicated and did not lead to vision recovery. B.C. may now have permanent vision loss in both eyes.

140. B.C. has suffered and continues to suffer from physical injuries, and this infirmity has caused him to be victimized in prison.

***R.F.***

141. R.F. is incarcerated in the FDC system and has been since 2018.

142. Defendants delayed R.F.'s cataract surgery for six years for nonmedical reasons.[1] During that time, R.F. suffered from legal blindness and physical injuries due to not being able to see.

143. In June 2019, R.F. was diagnosed with legal blindness due to mature, dense cataracts in both eyes.

144. In October 2019, an ophthalmologist recommended R.F. for cataract surgery.

145. However, surgery, despite being approved, was not scheduled.

146. In January of 2020, R.F. was seen by an optometrist who noted that R.F. was "unable to function safely due to cataracts," that the ophthalmologist had already recommended surgery, and that he recommended it too.

147. However, surgery was still not scheduled.

148. In January of 2023, R.F. was placed on a waitlist to see a different ophthalmologist.

149. Six months later, in June 2023, R.F. saw the ophthalmologist, who wrote that he had "severe" cataracts. He noted that R.F. is "ready for surgery and recommend ASAP."

150. However, again, surgery was never scheduled.

151. In November of 2023, R.F. saw a second optometrist who again recommended cataract surgery and noted that he had difficulty seeing R.F.'s retina due to the maturity of the cataract. The optometrist wrote that R.F. had a possible detached retina but that he was unable to fully evaluate R.F.'s eye due to the maturity of the cataract.

---

[1] For some of this time R.F. was incarcerated at Graceville Correctional Facility at which medical care was provided by other private companies, but Defendant FDC was ultimately responsible for his care during this entire time. R.F. was also incarcerated at institutions served by Centurion in January through February of 2018, June through September of 2023, and April of 2024 through approximately September of 2025.

152. On or around July of 2023, R.F. was seen by a third ophthalmologist who noted "[v]ery dense cataract[s]" and recommended a more complicated surgery due to their advanced state.

153. On February 25, 2025, undersigned counsel sent a letter via email to Defendants, notifying them of their unlawful policy and practice of delays in eyecare, including examples of 15 people who had been subjected to these delays, with descriptions of what had occurred to each person. R.F. was one of those examples.

154. Finally, in April 2025, R.F. was evaluated by a fourth ophthalmologist. Like the other doctors, he recommended complex cataract surgery in both eyes.

155. The doctor performed the surgery in R.F.'s right eye in May of 2025 and in his left eye in August of 2025—almost six years after surgery was initially recommended.

156. Due to the delay in surgeries, R.F.'s surgeries were complicated, and he now suffers from vision problems.

157. Nonetheless, R.F. was made to suffer for preventable blindness for years due to Defendants' deliberate indifference to his serious medical need.

***C.G.***

158. C.G. is incarcerated in the FDC system and has been in since 2001.

159. Defendants delayed C.G.'s cataract surgery for over five years for nonmedical reasons. During that time, C.G. suffered from legal blindness and physical injuries due to not being able to see.

160. In December 2019, C.G. reported through a sick call form that the vision in his right eye had become blurred and cloudy.

161. The following month, C.G. was seen by an optometrist who documented that he had cataracts and glaucoma and that the vision in his right eye was 20/200.

162. Despite C.G.'s serious vision loss that clearly qualified him for surgery, he was not referred for surgical consultation.

163. Over a year later, in March 2021, C.G. saw a new optometrist. This optometrist wrote that C.G. had glaucoma and cataracts and noted that he should be considered for cataract surgery.

164. Again, despite the optometrist's recommendation and C.G.'s serious vision loss that clearly qualified him for surgery, C.G. was not referred for surgical consultation.

165. Since C.G. was not permitted cataract surgery, his vision deteriorated to blindness in both eyes.

166. In July of 2023, an optometrist wrote that C.G.'s visual acuity was "LP" in both eyes, meaning his vision was reduced to only being able to perceive light—not count fingers, not detect hand movements, or read letters—and that he needed cataract surgery.

167. But instead of seeing a provider, C.G. was placed on a waitlist, where he remained for over one year.

168. C.G. finally saw the ophthalmologist in January 2025, over five years after he had begun to suffer from serious vision loss. The ophthalmologist recommended surgery in both eyes.

169. On February 25, 2025, undersigned counsel sent a letter via email to Defendants, notifying them of their unlawful policy and practice of delays in eyecare, including examples of 15 people who had been subjected to these delays, with descriptions of what had occurred to each person. C.G. was one of those examples.

170. However, surgery wasn't performed on C.G.'s left eye until on or around June 2025.

171. Surgery wasn't performed on C.G.'s right eye until on or around August 2025.

172. Due to the delay in surgery, C.G.'s surgeries were complicated, and he now suffers from vision problems.

173. Nonetheless, C.G. was made to suffer from preventable blindness for years due to Defendants' deliberate indifference to his serious medical need.

***D.H.***

174. D.H. is incarcerated in the FDC system and has been in since 2003.

175. Defendants delayed D.H.'s cataract surgery for nearly three years for nonmedical reasons. During that time, D.H. suffered from legal blindness and physical injuries due to not being able to see. Due to the delay in surgery, D.H.'s surgeries were complicated, and he may suffer from permanent vision loss.

176. In July 2022, D.H. was diagnosed with vision loss that could not be corrected by glasses due to cataracts. The provider wrote that his left eye visual acuity was 20/200 and his right eye visual acuity was 20/100 and noted that D.H. needed cataract surgery.

177. However, despite his clear need for cataract surgery, Defendants did not permit D.H. to see an ophthalmologist for almost a year.

178. In June 2023, D.H. finally saw an ophthalmologist who recommended surgery.

179. However, his surgery was not scheduled.

180. In March of 2024, D.H. was added to Centurion's waitlist for cataract surgery evaluation, where he remained for nine months.

181. In December of 2024, D.H. saw a second ophthalmologist, who also recommended surgery. The second ophthalmologist noted that D.H. was almost completely blind.

182. D.H. finally received cataract surgery in his right eye on February 20, 2025, over one and a half years after the ophthalmologist's recommendation.

183. On February 25, 2025, undersigned counsel sent a letter via email to Defendants, notifying them of their unlawful policy and practice of delays in eyecare, including examples of 15 people who had been subjected to these delays, with descriptions of what had occurred to each person. D.H. was one of those examples.

184. D.H. finally received surgery on his left eye in May 2025, almost two years after the ophthalmologist's recommendation.

185. D.H. has been told by a doctor that he has retina damage due to the delay in treating the cataracts and continues to suffer from vision problems.

186. D.H. was made to suffer for preventable blindness for years due to Defendants' deliberate indifference to his serious medical need.

***D.F.***

187. D.F. is incarcerated in the FDC system and has been in since 2009.

188. D.F. developed cataracts and was recommended for cataract surgery in both eyes by an ophthalmologist in May 2023.

189. However, Defendants refused to schedule him for surgery and his vision deteriorated.

190. D.F. saw a second ophthalmologist in May 2024 who also recommend cataract surgery in both eyes.

191. D.F. finally received cataract surgery in his left eye in January 2025, a year and a half after the initial recommendation.

192. On February 25, 2025, undersigned counsel sent a letter via email to Defendants, notifying them of their unlawful policy and practice of delays in eye care, and including examples of 15 people who had been subjected to these delays, with descriptions of what had occurred to each person. D.F. was one of those examples.

193. However, D.F. has still not received surgery in his right eye, and his vision has continues to deteriorate.

194. He has serious vision loss in his right eye, and, despite the removal of the cataract from his left eye, an ophthalmologist has determined that the cataract in his right eye has decreased his overall vision such that it substantially interferes with his daily life.

195. The delay has caused progressive deterioration of his right eye, placing him at risk of blindness. He has filed multiple grievances, each met with the same response—that he has been approved for surgery—yet the surgery has not occurred.

196. D.F. was made to suffer from preventable vision loss for years due to Defendants' deliberate indifference.

## **Class Action Allegations**

197. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs seek to certify a class of all current and future prisoners in FDC custody who have been diagnosed, or will be diagnosed, with a cataract (the "Plaintiff Class").

198. Defendants have the ability to identify all such similarly situated class members, through medical and other records in Defendants' possession.

199. The requirements of Rule 23(a) are satisfied:

a. *Numerosity*. The class is so numerous that joinder of all members is impracticable. National estimates suggest there are likely at least 2,000 FDC prisoners with

cataracts. Records maintained by Defendant Centurion show that there was a waitlist of 1,000 prisoners who needed cataract surgery in 2024.

b. *Commonality*. There are questions of law or fact common to the class, including but not limited to: 1) whether a cataract is a serious medical need; 2) whether Defendants have knowingly failed to provide the necessary cataract surgeries in accordance with the prevailing standard of care; 3) whether Defendants have knowingly employed policies and practices that unjustifiably delay or deny treatment for cataracts; 4) whether Defendants have permitted cost considerations to improperly interfere with the treatment of cataracts.

c. *Typicality*. The claims or defense of the class representatives are typical of the claims or defenses of the class. The class representatives have been diagnosed with cataracts but have been refused treatment; each suffers from the same temporary loss of vision, risk to physical safety, and interference with daily activities, as well as the risk of other complications, and potential permanent vision loss as other class members.

d. *Adequacy*. The class representatives and class counsel will fairly and adequately protect the interests of the class. The class representatives are committed to obtaining declaratory and injunctive relief that will benefit them as well as the class by ending Defendants' unconstitutional policy and practice. Their interests are consistent with and not antagonistic to the interests of the class. They have a strong personal interest in the outcome of this case and have no conflicts with class members. They are represented by experienced counsel who specialize in civil rights and class action litigation on behalf of prisoners.

200. The requirements of Rule 23(b)(2) are satisfied, as Defendants have acted and refused to act on grounds generally applicable to the class so that final declaratory and injunctive relief would be appropriate to the class as a whole. Injunctive relief will end the policy and practice for all class members, allowing them to receive proper and timely medical evaluation and treatment for cataracts.

## CAUSES OF ACTION

### COUNT I
### Violation of the Eighth and Fourteenth Amendments via 42 U.S.C. § 1983
### (Against All Defendants)
### Via 42 U.S.C. § 1983

201. Plaintiffs and the Plaintiff Class restate and reallege the preceding paragraphs of this Complaint as if fully set forth herein.

202. Defendants and their policymakers know about and enforce the policies and practices described herein. Defendants and their policymakers know of Plaintiffs' and the Plaintiff Class's serious medical needs, yet Defendants have intentionally failed and refused to provide treatment that will address those serious medical needs, knowing that those actions have resulted, and will continue to result, in Plaintiffs' and the Plaintiff Class's continued suffering and serious vision loss, falls, fractures, abuse, and even death.

203. Defendants and their policymakers have acted, and continue to act, with subjective recklessness as used in the criminal law. They actually knew and know that their own acts or omissions have put the Plaintiffs and the Plaintiff Class at substantial risk of serious harm. Defendants and their policymakers have failed to respond reasonably to that risk.

204. Defendants have caused the wanton infliction of pain upon FDC prisoners with cataracts and have exhibited deliberate indifference to the serious medical needs of Plaintiffs and the Plaintiff Class, in violation of the Eighth and Fourteenth Amendments.

205. Defendants know, and have known, of the substantial risk of serious harm, and actual harms, faced by FDC prisoners with cataracts. Yet Defendants have disregarded, and continue to disregard, those risks and harms by failing to provide the very treatment that would alleviate those risks and harms. Defendants have been deliberately indifferent to the substantial risk of serious harm to FDC prisoners with cataracts.

206. By denying Plaintiffs and the Plaintiff Class their medically necessary cataract surgeries, Defendants have imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment, which is made applicable to the State of Florida and by extension, Defendants, by the Fourteenth Amendment.

207. Defendants' denial of Plaintiffs and the Plaintiff Class's medically necessary cataract treatment violates all standards of decency, contrary to the Eighth Amendment.

208. Defendants' actions with respect to Plaintiffs and the Plaintiff Class amount to grossly inadequate care.

209. Defendants' actions with respect to Plaintiffs and the Plaintiff Class is medical care so cursory as to amount to no medical care at all.

210. As a direct and proximate cause of this pattern, practice, policy, and deliberate indifference, Plaintiffs and the Plaintiff Class have suffered, and continue to suffer from harm and violation of their Eighth and Fourteenth Amendment rights. These harms will continue unless enjoined by this Court.

## PRAYER FOR RELIEF

211. WHEREFORE, Plaintiff Randall Barde and Plaintiff Carla Varner demand the following relief:

a. An order certifying this case as a class action, with the class defined under Rule 23(b)(2) (seeking only declaratory and injunctive relief) as all current and future prisoners in FDC custody who have been, or will be, diagnosed with a cataract;

b. A judgment declaring that the Defendants have exhibited deliberate indifference to the serious medical needs of Plaintiffs and the Plaintiff Class and have violated Plaintiffs' and the Plaintiff Class's right to be free from Cruel and Unusual Punishment, as secured by the Eighth and Fourteenth Amendments to the Constitution;

c. Preliminary and permanent injunctive relief for Plaintiff Randall Barde requiring Defendants to provide him with cataract surgery for his right eye, along with all appropriate follow-up care, and to send him to a qualified ophthalmologist for evaluation of cornea transplantation, and to abide by the ophthalmologist's recommendations;

d. Preliminary and permanent injunctive relief for Plaintiff Carla Varner requiring Defendants to provide her with cataract surgery for her left eye, along with all appropriate follow-up care for both eyes;

e. Preliminary and permanent injunctive relief for the Plaintiff Class requiring Defendants to immediately provide cataract surgery to all FDC prisoners who have been recommended for surgery; for those prisoners with cataracts who have not seen an ophthalmologist, to immediately send all such prisoners to an ophthalmologist for a surgical consultation, and to abide by the ophthalmologist's recommendations; for those prisoners that continue to suffer from vision loss after cataract surgery, to immediately send all such prisoners to an ophthalmologist for

further treatment consultation, and to abide by the ophthalmologist's recommendations; and, to develop and implement a plan that ensures future prisoners with cataracts have timely access to specialists and that recommended surgeries are performed timely;

f. An award of all damages permitted by law, including but not limited to compensatory, nominal, and punitive damages against Defendant Centurion for Plaintiff Randall Barde and Plaintiff Carla Varner, individually;

g. An award of Plaintiffs' and the Plaintiff Class's attorneys' fees, expenses, and costs of suit; and

h. Such other relief as the Court may deem equitable and just under the circumstances.

**Jury Demand**

Plaintiffs demand trial by jury on all issues which are triable by jury.

Respectfully submitted,

By: *s/ Erica Downs*
Erica Downs

**Dante P. Trevisani**
Florida Bar No. 72912
E-mail: *dtrevisani@fji.law*
**Erica Downs**
Florida Bar No. 120581
E-mail: *edowns@fji.law*
Florida Justice Institute, Inc.
40 NW 3rd Street, Suite 200
Miami, Florida 33128
305-358-2081
305-358-0910 (Fax)

**WINSTON & STRAWN LLP**

Kristin McGough (*pro hac vice forthcoming*)

1901 L Street, N.W.
Washington, D.C. 20036
*kmcgough@winston.com*
(202) 282-5000

Gabriela Plasencia
Florida Bar No. 115788
Camila T. Machado
Florida Bar No. 1049806
200 S. Biscayne Blvd., Suite 2400
Miami, FL 33131
*cmachado@winston.com*
(305)-910-0500

**Attorneys for the Plaintiffs and Plaintiff Class**